## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CAROLYN COX, as the Special Administrator of the Estate of Charles Jernegan, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 11-CV-457-JED-FHM |
| STANLEY GLANZ, SHERIFF OF TULSA COUNTY, in His Individual and Official Capacities, *et al.,* | ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE
## EXPERT TESTIMONY OF DEFENDANTS' WITNESS, ARTHUR W. ROUSSEAU

**COMES NOW** Plaintiff, Carolyn Cox, as the Special Administrator of the Estate of Charles Jernegan ("Mr. Jernegan"), Deceased, and respectfully requests that this Court enter an Order in Limine precluding the testimony of Arthur W. Rousseau, as set forth herein. In support of this Motion, Plaintiff shows the Court as follows:

**I.      Introduction and Factual Background**

Defendants have retained Dr. Arthur W. Rousseau ("Dr. Rousseau"), a psychiatrist, to provide expert testimony concerning Mr. Jernegan's mental health treatment while incarcerated at the Tulsa County Jail. *See* Rousseau Report (Ex. A). It is uncontested that Mr. Jernegan died after hanging himself in a general population cell at the Tulsa County Jail. It would seem obvious, as the State Medical Examiner found, that Mr. Jernegan committed suicide. However, Dr. Rousseau has another theory. According to Dr. Rousseau, Mr. Jernegan did not actually commit suicide but, rather, died from a "failed parasuicide." *Id.* at 6. More specifically, Dr. Rousseau opines as follows:

1

> With regard to Mr. Jernegan's suicide, it is within a medical probability that Mr. Jernegan did not want to die, but wanted to be segregated from the cell population and saw that a "suicide attempt" could achieve this goal.  In clinical terms, this is referred to as a "failed parasuicide."

*Id.*  Dr. Rousseau's "failed parasuicide" theory is not sufficiently reliable to be admitted into evidence.

First, the "failed parasuicide" theory is based on pure speculation.  There is not one shred of factual support for the opinion.  During his deposition, Dr. Rousseau claimed he relied exclusively on several recorded phone calls Mr. Jernegan made while at the Jail in determining that Mr. Jernegan "did not want to die, but wanted to be segregated from the cell population and saw that a 'suicide attempt' could achieve this goal."  *See* Rousseau Depo. (Ex. B) at 55:20 – 56:4.  However, as Dr. Rousseau admits, Mr. Jernegan never said he wanted to be segregated from the cell population during any of the phone calls.  *Id.* at 57:11-13.  Additionally, Dr. Rousseau acknowledges Mr. Jernegan never said, or suggested, that a suicide attempt could achieve this purported goal during any of the phone calls.  *Id.* at 57:14-18.  In other words, there is absolutely no factual support for Dr. Rousseau's "failed parasuicide" theory.  None.

Second, there is no known clinical support for Dr. Rousseau's "failed parasuicide" theory to be found in any peer-reviewed medical literature, or in any other source material for that matter.  In his Report, Dr. Rousseau does not cite to, mention or reference in any way, any authority which supports his "failed parasuicide" theory.  *See* Rousseau Report (Ex. A).  Dr. Rousseau concedes that his Report does not provide any scientific or medical texts -- or other reference materials -- that use the term, "failed parasuicide."  *See* Rousseau Depo. (Ex. B) at 51:17 – 52:9.  *See also id.* at 78:25 – 79:2 ("Q.  Are there studies which have undertaken to identify cases of failed parasuicide?  A.  That I don't know.").  While Dr. Rousseau assured counsel for Plaintiff that he would be "happy" to provide "plenty of references" to "failed

parasuicide," no such references have been forthcoming. *Id.* at 52:2-3. Further, Dr. Rousseau cannot point to any study or medical literature that has identified hanging as a method of "failed parasuicide." *Id.* at 53:16 – 54:11. Clearly, Dr. Rousseau's "failed parasuicide" theory lacks the necessary factual and scientific support to be sufficiently reliable.

More fundamentally, Dr. Rousseau's opinions as a whole are not relevant because they are purportedly based on phone calls that played no role in the mental health treatment Mr. Jernegan received at the Jail. Plainly, the phone calls are the cornerstone of Dr. Rousseau's opinions. *See, e.g.,* Rousseau Report (Ex. A) at 4 ("During the seven phone conversations, Mr. Jernegan never spoke of suicidal thoughts. He often spoke of the future….); 5 ("Although there were times [during the phone calls] when [Mr. Jernegan] expressed remorse and sadness…., he did not express feelings of helplessness…."); Rousseau Depo. (Ex. B) at 46:18 – 47:5; 56:1-4; 82:21 – 83:9. Despite his reliance on the phone calls in arriving at his opinions, there is no evidence that the phone calls were utilized by corrections or medical staff at the Jail in assessing Mr. Jernegan's mental health needs. Rousseau Depo. (Ex. B) at 86:11-16. Therefore, the phone calls are plainly irrelevant to the question of whether Defendants provided appropriate care.

Dr. Rousseau's opinions should be precluded.

## II.   Legal Standard

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, "Fed. R. Evid. 702 imposes on the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).  As an initial matter, the court must determine the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion.  *Id.*

Next, the court must ensure that the scientific testimony being offered is "not only relevant, but reliable."  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).[1]  "To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge . . . ."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).  The Supreme Court has explained that the term "scientific" "implies a grounding in the methods and procedures of science."  *Daubert*, 509 U.S. at 590.  Likewise, it has explained that the term "**knowledge" "connotes more than subjective belief or unsupported speculation."**  *Id.* (emphasis added).  "The court ***must reject unsupported speculation*** as well as testimony that is based on unreliable methodology."  *Vigil v. Burlington Northern and Santa Fe Railway Co.,* 521 F.Supp.2d 1185, 1204 (D.N.M. 2007) (citations omitted) (emphasis added).

The Supreme Court has set forth four non-exclusive factors that a court may consider in making its reliability determination: (1) whether the theory or technique can be (and has been) tested, *Daubert*, 509 U.S. at 593; (2) whether the theory or technique has been subjected to peer review and publication, *id.*; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation, *id.* at 594; and (4) whether the theory or technique has general acceptance in the scientific community, *id.*  The inquiry is "a flexible one."  *Id.*; *see also id.* at 593 ("[m]any factors will bear on the inquiry, and we do not

---

[1]     The Supreme Court held in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), that the gatekeeping function set out in *Daubert* applies not only to expert testimony based on scientific knowledge, but also expert testimony based on technical or other specialized knowledge -- *i.e.,* it applies to all expert testimony.

presume to set out a definitive checklist or test"); *Dodge*, 328 F.3d at 1222 ("the list is not exclusive").  "The focus [of the inquiry] . . . must be solely on principles and methodologies, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

Importantly, "[n]either *Daubert* nor the Federal Rules of Evidence 'require[] a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.'"[2]  *Norris v. Baxter Healthcare Corp.,* 397 F.3d 878, 886 (10th Cir. 2005) (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)).  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.  See also, Rains v. PPG Industries, Inc.,* 361 F.Supp.2d 829, 833-34 (S.D.Ill. 2004); *Vigil,* 521 F.Supp.2d at 1204-05.

## III.    Argument

### A.    Dr. Rousseau's "Failed Parasuicide" Theory is Unreliable

Dr. Rousseau's "failed parasuicide" theory is patently unreliable.  The chief problem with Dr. Rousseau's "failed parasuicide" opinion is that it is void of any discernible factual or analytic foundation.  *See, e.g., Brown v. Am. Honda Motor Co.,* 939 F.2d 946, 952 (11th Cir. 1991).  Dr. Rousseau did not employ *any* clear methodology, let alone a reliable methodology that meets the dictates of *Daubert*.  He simply makes leaps in logic, with no factual or analytical basis, in opining that Mr. Jernegan died from a "failed parasuicide."  Whatever "basis" Dr. Rousseau has for his opinions, it is not scientific -- it is pure speculation.

Again, Dr. Rousseau relied exclusively on certain recorded phone conversations that Mr. Jernegan had in concluding that Mr. Jernegan "did not want to die, but wanted to be segregated from the cell population and saw that a 'suicide attempt' could achieve this goal."  *See* Rousseau

---

[2]      The translation of "*ipse dixit*" from Latin: "It is, because I say so."

Depo. (Ex. B) at 55:20 – 56:4.  But, Mr. Jernegan never said he wanted to be segregated from the cell population during these recorded calls.  *Id.* at 57:11-13.  Nor did Mr. Jernegan ever even suggest that a suicide attempt could achieve this alleged goal during any of the phone calls.  *Id.* at 57:14-18.  Therefore, there is no factual support for Dr. Rousseau's theory whatsoever.  Stripped to its core, the "basis" for Dr. Rousseau's opinions concerning the data is really nothing more than the *ipse dixit* of Dr. Rousseau himself.  He is merely speculating and offering his "subjective belief" that Mr. Jernegan died from a "failed parasuicide."  *See Daubert,* 509 U.S. at 590; *Vigil,* 521 F.Supp.2d at 1204.

In addition to the lack of factual support for the "failed parasuicide" theory, there is no apparent clinical or scientific basis for it either.  Indeed, the very idea that Mr. Jernegan did not actually commit suicide is patently absurd.  In any event, there is no evidence in the record that Dr. Rousseau's "failed parasuicide" by hanging theory has been or could be tested, or has been subject to any scientific peer review.  Dr. Rousseau offered no general scientific acceptance for his theory.  Indeed, Dr. Rousseau has yet to cite to or provide any reference to "failed parasuicide" by hanging in any study or scientific or medical literature of any kind. Consequently, his opinion lacks any reliable methodology and provides no trustworthy assistance to the jury.  *See Daubert*, 509 U.S. at 593

**B.**     **Dr. Rousseau's Opinions Are Not Relevant**

Above all else, Dr. Rousseau relies on Mr. Jernegan's recorded phone conversations in arriving at all of his opinions.  *See* Introduction, *supra.*   However, these recorded phone conversations clearly played no role in the mental health care, or lack of mental health care, that Mr. Jernegan received while at the Jail.  The phone calls only provide fodder for Dr. Rousseau to be the proverbial "Monday morning quarterback" in rendering new diagnoses and in speculating

6

that a man who killed himself did not really wish to die.

Moreover, the phone calls provide an even more sinister and prejudicial purpose.  That is, Dr. Rousseau distorts the phone calls, under the guise of a new "Personality Disorder" diagnosis, to raise highly prejudicial and facially irrelevant assertions about Mr. Jernegan's sexual relationships.  *See* Rousseau Report (Ex. A) at 5-6.  Dr. Rousseau goes so far as to make the unsubstantiated claim that Mr. Jernegan had a sexual relationship with an underage girl.  *Id.*  The purpose of this is clear.  Defendants seek to use recorded phone conversations that had no part in shaping Mr. Jernegan's course of treatment to create a prurient and prejudicial sideshow.  Because these phone calls have no probative value, and will only serve to prejudice Plaintiff, Dr. Rousseau's opinions, which rely on the phone calls, are not relevant, and should be precluded.

WHEREFORE, premises considered, Plaintiff respectfully requests that this Court enter an Order in Limine precluding the testimony of Arthur W. Rousseau.

Respectfully submitted,

s/Robert M. Blakemore
Louis W. Bullock, OBA #1305
lbullock@bullock-blakemore.com
Patricia W. Bullock, OBA #9569
pbullock@bullock-blakemore.com
Robert M. Blakemore, OBA #18656
bblakemore@bullock-blakemore.com
Bullock Bullock & Blakemore PLLC
110 West Seventh Street, Suite 707
Tulsa, OK 74119
Phone:  (918) 584-2001
Fax:  (918) 779-4383

Donald E. Smolen, II, OBA #19944
donaldsmolen@ssrok.com
Daniel E. Smolen, OBA #19943
danielsmolen@ssrock.com
Laura M. Lauth, OBA #22619
lauralauth@ssrok.com

John T. Beesley, OBA #30484
johnbeesley@ssrock.com
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone:  (918) 585-2667
Fax:  (918) 585-2669

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day February 2013, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel who have entered an appearance in this action.

s/Robert M. Blakemore