**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CAROLYN COX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11-CV-457-JED-FHM** |
| **v.** | ) | |
| | ) | |
| **STANLEY GLANZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court is defendant Tulsa County Sheriff Stanley Glanz's Motion for Summary

Judgment (Doc. 198).  Plaintiff filed a Response (Doc. 233), and Glanz filed a Reply (Doc. 255).

The  Court  also  heard  oral  arguments  on  the  Motion.   Upon  consideration  of  the  parties'

submissions and arguments, the Court determines that there are genuine disputes as to material

facts, rendering summary judgment inappropriate.

### I.      Background

On July 27, 2009, Charles Jernegan surrendered to the Tulsa County Sheriff's Office

(TCSO) at the Tulsa County Jail on an outstanding warrant.  He was arrested at 11:50 a.m.,

immediately booked into the Jail, and placed in the Jail's general population.  Less than 70 hours

later, Mr. Jernegan was found unresponsive and hanging from a bed sheet in his cell.  Shortly

thereafter, he was pronounced dead at a Tulsa hospital.

Carolyn Cox, who is Mr. Jernegan's mother and the Special Administrator of his Estate,

initiated  this  lawsuit  against  Sheriff  Glanz  (and  others)  under  42  U.S.C.  §  1983,  alleging

violations of Mr. Jernegan's rights under the Eighth and Fourteenth Amendments.[1]  Among other

allegations, plaintiff asserts that the Sheriff is liable in his individual and official capacities for

---

[1]  Claims against all defendants other than the Sheriff have been previously dismissed.

establishing and maintaining an unconstitutional policy, custom, and practice of deficient mental health screening, evaluation, and treatment for Jail inmates like Mr. Jernegan, that the Sheriff has failed to adequately train and supervise staff, and that such practices and TCSO's treatment of Mr. Jernegan constitute deliberate indifference to Mr. Jernegan's health and safety. Plaintiff also asserts that the Sheriff and his Jail staff knew or should have known that Mr. Jernegan was at serious risk of harm, because of his prior, recent history at the jail, as well as information he provided upon booking and intake shortly before he committed suicide.

Sheriff Glanz moves for summary judgment, arguing that he cannot be held liable because there is no evidence of deliberate indifference by the Sheriff or Jail staff and there is no evidence of any policy or practice that caused the death of Mr. Jernegan.

## II.     General Standards Applicable to Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "By its terms, [the Rule 56] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Id.* at 251-52.  The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor.  *Id.* at 255.

III.    **The Evidence**

The Court has examined the entire summary judgment record, and the key evidence submitted by the parties is summarized below.

A.    ***Prior 2009 Jail Bookings***

Prior to the July 2009 detention, which ended with his death, Mr. Jernegan spent time in the Jail in January, February, and May 2009.  When booked into the Jail in January 2009, Mr. Jernegan reported that he had attempted suicide in the past, that he was, at the time of booking, experiencing paranoia, hearing voices or seeing things, and that he had been feeling nervous or depressed.  (Doc. 232-6, 232-7).  He was placed in the Jail's general population.  (Doc. 232-6).

Within a few days of his January 2009 booking, on January 11, 2009, he typed into the Jail "kiosk" computer system: "NEED HELP WITH ANXITY CLOSSTIFOBIT AND SUCIDLE PLEASE HELP."  (Doc. 232-9).[2]  On January 12, 2009, Jail staff provided a response via the Jail kiosk system, which plaintiff alleges to be a boilerplate response provided to any inmates reporting mental health issues during the same time frame: "You will be added to the mental health call out list.  Please keep in mind Dr. Harnish is only here 3 days a week."  (Doc. 232-9).  When Mr. Jernegan was seen by medical personnel later that day, he was "shaking all over," and he reported that "he has suicidal thoughts and so far has refrained from acting upon them."  (Doc. 232-12, Doc. 232-13).  He was admitted to medical for a mental health evaluation on January 12 and was subsequently released back into the Jail's general population.

---

[2]    The kiosk system at the Jail is a system "by which inmates submitted requests for medical or mental health attention electronically."  (Doc. 232-1 at ¶ 14).  Grammatical and spelling errors in transcripts of kiosk requests are recited here without correction.

On January 20, Jail staff noted that Mr. Jernegan was "real shaky and can't sit still for anything," and that he "hears voices." (Doc. 232-14 at 16). On January 22, he used the kiosk to report needing "MEDS" and that he was "GETING WORSE," and two days later (after the issue apparently had not been resolved), he reported "NERVES AND SHAKES ARE NOT ANY BETTER." (Doc. 232-9 at 4). After another three days passed, he typed "PLZ ANSWER ME MY PANIC ATTACTS AND INSOMNIA IS GETIN WORSE." (*Id.*). He received a response similar to prior responses: "You will be added to the mental health call out list. Please keep in mind Dr. Harnish is only here 3 half days a week." (*Id.*).[3] Days later, Jernegan reported: "I REALLY NEED MY PHYIC MEDS FOR MY PANIC ATTACTS AND INSOMIA. THIS IS CRAZY I NEED SOME HELP GOING CRAZY." (Doc. 232-9 at 5).

Mr. Jernegan again spent several hours in Jail custody on May 14, 2009. At the time of that booking, he reported that he was feeling paranoid, hearing voices or seeing things and had been feeling nervous or depressed for a few weeks. (Doc. 232-15). He reportedly denied during the May intake that he had attempted suicide in the past. (*Id.*). However, he reported that he was paranoid schizophrenic and had received mental treatment or hospitalization. (Doc. 232-16). He was placed in general population on May 14, 2009. (*Id.*).

### B.	July 2009 Incarceration and Death

During his arrest and booking at the Jail on July 27, 2009, Mr. Jernegan was asked a number of questions regarding mental health and suicide. In response to questions on one form

---

[3]	While these responses to Mr. Jernegan's January 2009 kiosk reports suggested that a response or visit from mental health personnel was somehow dependent upon Dr. Harnish's availability three days (or three "half days") per week, Mr. Jernegan was never seen by Dr. Harnish during any visit to the Jail. (Doc. 232-43 at 66, 73-74). Dr. Harnish was the only psychiatrist on staff at the Jail in 2009, and he worked part-time, spending 20 hours per week at the Jail. He had no supervisory authority over the Jail's mental health team, which was supervised by the director of the infirmary. (*Id.* at 13, 86-87).

administered by the arresting TCSO officer, Mr. Jernegan answered "No" to the questions "Are you injured or currently under psychiatric or a general Doctor's Care?," "Are you currently taking any prescription medications?," and "Do you feel suicidal, or have you thought about harming yourself in the past 24 hours?" (Doc. 198-12). In response to a General Information form, Jernegan reportedly answered "N" [for "No"] in response to the question "Are you currently thinking of committing suicide?" (Doc. 198-13).

During Jail intake, a detention officer asked Mr. Jernegan questions from a Mental Health Referral Screening form. A copy of those questions and Jernegan's responses is provided below:

| Section 2 | | | |
|---|---|---|---|
| **Questions** | **No** | **Yes** | **General Comments** |
| 1. Do you currently feel paranoid, hear voices that others do not hear or see things that others do not see? | | X | |
| 2. Have there currently been a few weeks when you felt nervous or depressed? | | X | |
| 3. Have you ever tried to kill yourself? | X | | |
| 4. Are you now thinking about hurting or killing yourself? | X | | |
| 5. Are you currently taking any medication prescribed for you by a physician for any emotional or mental health problems? | | X | Diag. Paranoid - Schizo |
| 6. Have you ever been in a hospital for emotional or mental health problems? | X | | |

(Doc. 232-17; *see also* Doc. 198-14 [same form but less legible]). The form contains "Referral Instructions" which direct that

> *This inmate should be referred for further mental health evaluation if he/she answered:*
> * *YES to Item 5 OR*
> * YES to Item 6 OR
> * *YES to at least 2 of Items 1 through 4* OR
> * If you feel it is necessary for any other reason.

(*Id.*) (italics added).  Because he answered "YES" to Item 5 and he supplied "YES" answers to Items 1 and 2 of the first four questions, Mr. Jernegan's answers satisfied two of the independent bases for referral for "further mental health evaluation" pursuant to the Referral Instructions on the face of the form. (*See id.*, shaded area of form). [4]  There is no indication that the detention officer or any other person at the Jail referred Mr. Jernegan for any "further mental health evaluation." (*See id.*).

As part of the ordinary medical intake process at the jail, Faye Taylor, a Licensed Practical Nurse, completed an additional Intake Screening form on July 27, 2009.  (Doc. 232-18).  In response to the questions on that form, Mr. Jernegan again reported that he had received mental health treatment or had been hospitalized for paranoid schizophrenia, but he denied that he had attempted suicide or was at that time suicidal.  (*Id.*).  Mr. Jernegan was placed in the Jail's general population.  (*See id.*).

Ms. Taylor testified that the "extent of [her] mental health training" was "a questionnaire that we would go over, questions to ask."  (*See* Doc. 232-19 at 15).  She was unsure whether she was provided with any mental health guidelines, and she did not recall whether she received any TCSO policies or procedures before she began working at the Jail.  (*Id.* at 15-16).  When asked whether "paranoid schizophrenia is a serious mental health disorder," she was unwilling to provide a yes or no response and stated that "[a] mental health team could give you that answer. I'm not trained in mental health. . . ."  (*Id.* at 61). She further testified as follows:

Q.	What are the symptoms of paranoid schizophrenia?

---

[4]	The parties do not focus on the shaded area of the form.  However, both parties reference and attach the document to their summary judgment filings and rely upon the questions on the document as important evidence relating to this case.  The Court is not constrained by only the specific portions of the record cited by a party and "may consider" other materials in the record. *See* Fed. R. Civ. P. 56(c)(3).

A.      I am not - - once again, I'm referring that to the mental health team.

(*Id.* at 62).

Q.      What's the extent of your training as to paranoid schizophrenia?  . . .

A.      We have in-services on mental health on when you refer them to suicide watch or further mental health treatment and we have those in-services. But as far as the particulars of going into detail diagnosis and stuff, that's what we have the mental health physicians for and the mental health team.

Q.      But you didn't refer him to the mental health team, correct?

A.      This - - this particular one?

Q.      You didn't refer Mr. Jernegan to the mental health team, correct?

A.      That's correct.

(*Id.* at 78-79).

Despite her apparent lack of identifiable (or memorable) mental health training and knowledge about the seriousness of paranoid schizophrenia as a mental health condition, it was Ms. Taylor who was entrusted with the power to determine the placement of Mr. Jernegan in the Jail and to decide whether he would be referred for further mental health evaluation.  (*See id.* at 62, 74-75, 78).  She placed him in the Jail's general population, and did not refer him for further mental health evaluation.  (*See* Doc. 232-18 [selecting "General population"]; *see also* Doc. 232-19 at 82, 83).  Nor did Ms. Taylor review the Mental Health Referral Screening (a portion of which is copied above) that was completed by the TCSO detention officer, because "[t]here would be no need to because I have my own intake screening."  (Doc. 232-19 at 75).  As noted, that mental health screening form, *on its face*, directed that Mr. Jernegan be referred for further mental health evaluation.  (*See* Doc. 232-17).

On July 28, 2009, one day after his placement in general population, Mr. Jernegan typed a request into the Jail kiosk computer system:  "I NEED SPEEK WITH SOME ONE ABOUT

7

PROBLEMS." (Doc. 232-24). From the categories available on the kiosk system, he identified his problem as "Type: MEDICAL" and "Sub Type: MENTAL HEALTH." (*Id.*). Approximately 22 hours later, on July 29, 2009, Jail personnel responded to him via the kiosk system: "You will be place [sic] on the Mental Health call out list for Thursday July 30, 2009. Please give 48-72 hours from time this was received to be seen, excluding Weekends and Holidays. Thank you." (Doc. 198-18).[5] On July 30, Mr. Jernegan was found hanging from a bed sheet in cell number J-1 at 9:26 a.m. Efforts to resuscitate him were reportedly initiated. He was subsequently transported to the hospital and later pronounced dead.

The parties dispute whether any effort was made by Jail staff to see Mr. Jernegan before he was found hanging in his cell. A mental health team member, Sara Sampson, reported that she attempted to see Mr. Jernegan at 8:00 a.m. on July 30, 2009, but he had been moved from Jail Pod F-18 to J-1 (on July 28), and she intended to follow up on him later. (*See* Doc. 198-20; *see also* Doc. 232-27 at 8). As plaintiff points out, the Jail's own log book for Pod F-18 is inconsistent with Ms. Sampson's claimed attempt to visit at 8:00 a.m. (*See* Doc. 232-27 at GLANZ0589). Also, plaintiff cites the report of a nurse, Robin Mason, as inconsistent with the purported 8:00 a.m. visit attempt. Immediately upon learning of Mr. Jernegan's suicide attempt and Ms. Sampson's claim to have attempted to make a mental health call at 8:00 a.m. to see Mr. Jernegan, nurse Mason reported to another TCSO staff member that Ms. Sampson's claim was suspect. (*See* Doc. 232-26 at GLANZ 0517). Specifically, Ms. Mason reported that the mental

---

[5] The parties did not supply information regarding the manner in which kiosk responses from Jail personnel are received by inmates. Thus, the Court is unaware whether an inmate who submits a request must keep checking the kiosk to see whether Jail personnel have responded or whether the inmate is somehow notified that there has been a response so that he knows to check the system to read the response. The Court has not located in the record any information which reflects whether Mr. Jernegan did or did not read the kiosk response which told him he was put on the call out list for July 30, 2009, but which implied that he might not actually be seen for 48-72 hours.

health department at the Jail is "known for cutting corners," (*see id.*) and she requested that TCSO obtain the surveillance video from Pod F-18 to determine whether Ms. Sampson had even attempted such a visit.  (*Id.*).  Ms. Mason asserts that she did not believe Ms. Sampson's report, in part, because she (1) had "never seen any member of the mental health team at the Jail as early as 8:00 a.m.," (2) had witnessed a meeting of members of the Jail mental health team (including Ms. Sampson), who were meeting, after Mr. Jernegan was found hanging in his cell, to make "sure to have consistent stories to provide to TCSO investigators," and (3) had previously witnessed "the falsification of records and reports at the Jail."  (Doc. 232-3 at 2-3).

Plaintiff's expert, Steven Hoge, M.D., has opined that, upon intake at the Jail, Mr. Jernegan should have been immediately identified as mentally ill, given his responses to the intake forms, but because his mental illness was disregarded, "mental health staff did not evaluate Mr. Jernegan [a]nd, as a result, he was not triaged, his risk of suicide was not assessed, nor was he housed separately under observation until appropriate medical evaluation could be placed."  (Doc. 232-8 at 11).  Dr. Hoge's opinion is that Mr. Jernegan should have been identified as a high risk inmate upon admission and should have been immediately referred for mental health evaluation because of his reported paranoid schizophrenia diagnosis and presentation with psychotic symptoms, as well as his history of suicidal thoughts while previously at the Jail, reflected he was at risk for suicide.  (*Id.* at 19).  Dr. Hoge further describes several issues with the Jail's medical and mental health practices which he opines are grossly deficient and put mentally ill inmates at risk of harm and which, in his opinion, directly contributed to Mr. Jernegan's death.  (*See id.* at 3-20).

### C.   Investigation into Mr. Jernegan's Death

Shortly after Mr. Jernegan's death, the Oklahoma State Department of Health (OSDH) conducted an investigation into the death and subsequently issued a Report and a Notice of Violation to the Jail.  (Doc. 232-20, 232-21).  The Report and Notice found violations of certain Oklahoma Jail Standards.   Specifically, the OSDH found a violation of the Jail Standard requiring that mentally ill inmates be separated from other inmates (Okla. Admin. Code 310:670-5-5(6)), finding that the "standard was not met because [Mr. Jernegan] was not properly segregated."  (Doc. 232-21).[6]   The Notice of Violation also cited noncompliance with Jail Standard 5-8 requiring that "[a]dequate medical care shall be provided in a facility" and the jail "administrator shall develop and implement written policies and procedures for complete emergency medical and health care services," finding the "policy used by Correctional Healthcare Management in direct conflict with the Oklahoma Jail Standards."  (*Id.*).

The OSDH also noted a violation of Jail Standard 5-8(2) "because [Mr. Jernegan] was not housed in an area for more frequent observations."  (*Id.*).[7]  The Notice of Violation also cited

---

[6]      The Oklahoma Jail Standards require that mentally ill prisoners "shall be segregated from other prisoners" and "[e]very effort shall be made to contact a local hospital, clinic or mental health facility for the detention of the mentally ill."  Okla. Admin. Code 310:670-5-5(6).

[7]      Standard 5-8(2) requires the following with respect to initial medical triage screening:

Medical triage screening shall be performed on all prisoners immediately upon admission to the facility and before being placed in the general population or housing area.  *Those individuals who appear to have a significant medical or psychiatric problem*, or who may be a suicide risk, *shall be transported to the supporting medical facility as soon as possible.  They shall be housed separately in a location where they can be observed frequently by the staff at least until the appropriate medical evaluation has been completed.*  If after stringent evaluation by the highest-ranking mental health professional, in conjunction with a senior detention supervisor, these prisoners may be authorized to share the same cell.

Okla. Admin. Code 310:670-5-8(2) (emphasis added).

10

the Jail for conducting an "[i]nappropriate medical evaluation." (*Id.*).  OSDH further noted its

finding that Mr. Jernegan "indicated a form of mental illness on his screening yet it appeared that

the proper steps as required in the Jail Standards were not taken."  (Doc. 232-20 at 3).

Sheriff Glanz argues that the Court should not consider the Oklahoma Jail Standards,

because "failure to comply with a state law or regulation such as jail standards is not a

constitutional violation."   (Doc. 255 at 4).   He cites one authority within this Circuit, an

unpublished district court case, *Estate of Hocker v. Walsh*, No. CIV-92-855-H, 1993 WL 664646

(W.D. Okla. Jan. 14, 1993), in support of his argument.   On appeal from that case, the Tenth

Circuit concluded that it need not address the jail standards "because the facts do not indicate

that the jail standards were violated in this case" and the sheriff "established policies essentially

mirroring the Oklahoma [standards] and the jail personnel followed these standards in admitting

Ms. Hocker and in determining that she did not exhibit a serious need for medical treatment."

*Estate of Hocker v. Walsh*, 22 F.3d 995, 1000, n.7 (10th Cir. 1994).  That case is distinguishable

inasmuch as there *is* evidence of violations of the standards in this case, and plaintiff has

submitted evidence supporting her claim that the Jail's operational practices and customs were in

direct conflict with the state standards.

In any event, while the Court agrees that a violation of jail standards does not establish a

constitutional violation, the jail standards (and the OSDH report and notice) may be relevant to

the § 1983 analysis, particularly to the extent that they relate to the policies and practices in place

at the Jail at the time of Mr. Jernegan's death.  Sheriff Glanz has recognized that the Oklahoma

Jail Standards provide for a "bare minimum" of inmate care, and he has acknowledged the Jail's

obligations to follow those standards. (Doc. 232-4 at 102, ll. 1-12).  Yet, according to plaintiff's

evidence, the procedures and customs in operation at the Jail before and at the time of Mr. Jernegan's death did not comply with those standards.

In a recent Tenth Circuit case, the court expressly referenced the OSDH report regarding a jail inmate whose death was at issue and also referred to the accompanying OSDH violation notice, which identified violations of the jail standards for five reasons.  *Layton v. Bd. of County Comm'rs of Okla. County*, 512 Fed. App'x 861, 865-66 (10th Cir. Mar. 12, 2013).  In another recent unpublished decision, *duBois v. Payne County Bd. of County Comm'rs*, No. 13-6144, 2013 WL 5952148, n.5 (10th Cir. Nov. 8, 2013), the Tenth Circuit found that the OSDH investigation and report regarding the inmate's death did not undermine the district court's summary judgment in favor of the defendants, because the "investigation did not reveal failures at a policy level and [did not] provide insight into what [the defendants] knew at the time of [the inmate's] death, inasmuch as it was performed after his death."  In contrast to *duBois*, the OSDH exhibits in this case, when taken as true, support plaintiff's allegations that there were policies, customs or practices in operation at the Jail which directly violated the Oklahoma Jail Standards, such that the OSDH findings do bolster plaintiff's assertions of "policy level" failures.  For example, the OSDH found that the "POLICY USED BY [the Jail's medical staff was] IN DIRECT CONFLICT WITH THE JAIL STANDARDS."  (*See* Doc. 232-20 at 5 of 9; *see also id.* at 4 of 9 [noting that Pam Hoisington, the Jail's Health Services Administrator, advised the OSDH that the Jail "allows 14 days for mental health evaluation," which the OSDH noted "is in direct conflict with the Jail Standards."]).

In addition, the Court notes that, in a § 1983 case involving a shooting death, the Tenth Circuit approved of the district court's admission of an agency investigative report by the Shooting Review Board, which was a body of the Oklahoma Department of Public Safety under

state law. *Perrin v. Anderson*, 784 F.2d 1040, 1046-47 (10th Cir. 1986). The Tenth Circuit has held that, "in civil actions, agency reports are admissible under Fed. R. Evid. 803(8)(C) if they are prepared pursuant to authority granted to the agency by law and are trustworthy." *Hall v. Western Prod. Co.*, 988 F.2d 1050, 1057-58 (10th Cir. 1993). "This rule covers both factual findings and 'conclusion and opinions found in evaluative reports of public agencies.'" *Id.* at 1058 (quoting *Perrin*, 784 F.2d at 1046); *see also Beech Aircraft v. Rainey*, 488 U.S. 153, 170 (1988) ("We hold, therefore, that portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion."). To be admissible under Rule 803(8)(C), the report must have been prepared "'pursuant to authority granted by law,' [which] helps to ensure that the report is reliable." *Perrin*, 784 F.2d at 1046 (quoting *Franklin v. Skelly Oil Co.*, 141 F.2d 568, 572 (10th Cir. 1944)). Pursuant to Oklahoma law, the Oklahoma Statement Department of Health is authorized to inspect county jails, and "[t]he results of these inspections shall be presented in the form of a written report to the Commissioner of Health and to the person immediately responsible for the administration of the facility inspected." *Okla. Stat.* tit. 74, § 193. In addition, to be admissible under Rule 803(8)(C), "circumstances must not indicate the report is untrustworthy." *Perrin*, 784 F.2d at 1047. Here, the Sheriff has not asserted that the report is untrustworthy. Indeed, it does not appear that the Sheriff argues that the report is in any way inaccurate, either in its findings or in its conclusions as to violations of the Jail Standards.

Another report relating to Mr. Jernegan's death was prepared by TCSO's medical auditor, Advanced Medical Systems, Inc. (AMS), which provided a "physical facilities review" and a "review [of] contract compliance, utilization, efficiency of contract between TCSO and medical service provider" (Doc. 313-1). With respect to Mr. Jernegan, AMS noted that the Jail medical

provider policy would require daily triage, but Jernegan was not seen in the two days between his kiosk request for help and his death.  As a result, AMS noted that "[i]f this inmate had wished to express a suicidal ideation, there is potential for it to be missed during a 2 day period."  (*Id.* at 5).  AMS also determined that "the process utilized for suicidal risk may be too superficial in patients at higher risk such as this inmate [history of paranoid schizophrenia – 184 p3-4] [and a] more detailed assessment tool may have identified his true risk."  (*Id.*) (first bracket within quote contained in original).  The AMS report grouped Mr. Jernegan with several other inmates as to which the review presented issues of "Triage and Protocol compliance, protocol appropriateness."  (*Id.* at 2-3 of 7).

### D.     Plaintiff's Evidence Regarding Sheriff Glanz's Alleged Knowledge of Deficiencies and Deliberate Indifference to Mentally Ill Inmates

Sheriff Glanz recognizes that he is ultimately responsible for the health and safety of inmates and for ensuring that mental health treatment is provided to inmates.  (*See* Doc. 317-1 at 14, 34). But plaintiff alleges that he demonstrated a continuing willingness, as reflected by deliberate and reckless inaction, to ignore serious risks to mentally ill inmates, to inadequately and untimely respond to requests from such inmates for help, and to improperly assess and alleviate suicide risks, which establish a long-standing and continuous pattern of inadequate mental health care that resulted in Mr. Jernegan's death.  In support, the plaintiff cites the following evidence.

Operation of the Jail was returned to Sheriff Glanz in July 2005.  (Doc. 232-4 at 13, ll. 4-7).  Prior to that time, the Tulsa County Jail was operated by Corrections Corporation of America (CCA).  (*See* Doc. 317-1 at 34-35).  While CCA operated the Jail, there was a mental health diversion program at the Jail, from which about 100 mental health referrals per month were made from the Jail to Tulsa County social services.  (*Id.*).  That system of referrals apparently was "lost

in the shuffle" and there have not been any such mental health referrals, or "very many," since Sheriff Glanz assumed operations at the Jail in mid-2005. (*Id.* at 34-39). The Sheriff attributed the lack of mental health referrals since 2005 to the cessation of grant funds for the mental health diversion program as it had been conducted when CCA operated the Jail. (*See id.* at 35-39). He also described additional changes in the booking process which apparently related to mental health screening. (*See id.* at 39).

The National Commission on Correctional Health Care (NCCHC) conducted an on-site audit of the Jail's health services program in 2007. (Doc. 232-31 at 36; *see also* Doc. 232-33, 232-34). Elandia Diane Maloy was the supervisor over medical records at the Jail during the 2007 NCCHC audit. (Doc. 232-32 at 117-118). According to Ms. Maloy, before commencement of the audit, Sheriff Glanz and Chief Deputy Albin conducted a meeting with department supervisors to emphasize the importance of passing the audit. (*Id.* at 123). At the meeting, Glanz allegedly said that "heads were going to roll" if the audit did not go well. (*Id.*). Maloy testified that, during that pre-audit meeting, Glanz and Albin conveyed that medical staff should hide from the NCCHC auditors any problem medical charts. Maloy testified as follows:

Q.     But your testimony is that certain files had been pulled and wouldn't even be available for [the auditors] to review; is that what you're telling us?

A.     Yes. . . . (*Id.* at 187). [8]

Q.     And you participated in pulling these files to put in the milk crate to hide from the auditors, correct?

A.     It was three ladies in there, so we all did, yes. . . .

---

[8]     Maloy stated that more than 20 inmate medical files were "pulled" in this manner so that they would be unavailable to the auditors. She also indicated that inmates were moved around the Jail, and even moved off premises, so that they would not be available to be seen by auditors. (*Id.* at 188).

Q.      You're not saying [Pam Hoisington, the Health Services Administrator at the Jail] did that at the direction of Tim Albin, are you?

A.      *We were told that, if it was a problem chart, that the auditors better not see those.*

Q.      (By Mr. Fortney)  Hold on. Pam Hoisington told you that?

A.      *It came from Chief Albin and Sheriff Glanz.*

Q.      *How were you communicated that from them?*

A.      *When we had the first meeting, it is discussed what charts were going to be placed for the auditors to see. . . . So it was told in that meeting that they didn't want them to see certain inmates. . . .*

Q.      *You're telling me that - - who said this?  Albin or Glanz, who said this?*

A.      *This came from Albin.*

Q.      *Your testimony under oath today is that Tim Albin told you all in a meeting to hide charts?*

A.      *Yes. . . . He said that he did not want the problem charts to be seen by the auditors, and he did not want the problem inmates to be seen by the auditors.*

(*Id.* at 188-190) (emphasis added).

Maloy also testified that, in the process of the NCCHC audit, Pam Hoisington asked Maloy to falsify medical charts and indicated that "[s]he wanted every chart to be kind of altered if there was something in there bad or if there were sick calls in the charts that were not addressed."  (*Id.* at 119).  Thus, Hoisington directed them to create false files that would be provided to NCCHC, and to select for review by NCCHC only charts of inmates who did not have medical issues and who were fit.  (*Id.* at 119-120).  They called them "dummy charts."  (*Id.*).  TCSO staff also attempted to steer the auditors to the preselected or dummy charts that were collected in baskets from which they wanted the auditors to choose.  (*Id.*).

Despite the alleged hiding of certain problematic charts and attempt to steer NCCHC to the dummy charts, the NCCHC issued a preliminary report in early 2007, noting problems to be addressed by an action plan.  (*See* Doc. 232-33).  Those problems included the following:

- Continuing Education was "not up to date," as a result of a shortage of staff and increased workloads.  (*Id.* at 4);

- Mental health screenings were not being completed correctly, due to a "lack of education on what screening forms to use."  The NCCHC noted a problem with staff education "on the need to fill out these forms in their entirety."  (*Id.* at 6);

- Additional problems were noted with mental health screenings not being completed during health assessments.  (*Id.* at 7).

- Mental health treatment plans were not complete due to a lack of proper charting procedure.  (*Id.* at 8); and

- There was a failure at the Jail to timely triage sick calls due to staff shortage with increased workloads.  (*Id.* at 10).

The final NCCHC audit report included findings that "health needs identified during receiving screening are not addressed in a timely manner."  (*See* Doc. 232-31 at 50, ll. 17-23). The findings also included a determination that "the follow up of inmates with mental health needs is not of sufficient frequency to meet their needs.  Once mental health issues were identified: 1, there was no consistent follow up by the mental health staff; 2, not everyone taking psychotropic medications had been scheduled for a follow-up evaluation; and 3, there was a noted delay in responding to routine mental health-related requests submitted by the inmates." (*See id.* at 62, ll. 4-17).  According to Maloy, the defects noted in the 2007 NCCHC audit were never addressed at TSCO, and medical care practices did not change.  (Doc. 232-32 at 123-124).

At deposition, Sheriff Glanz could not identify any changes to mental healthcare policies or practices at the Jail following the 2007 NCCHC audit and did not know whether any changes had been made.  (Doc. 232-4 at 162-163).  Glanz also testified that he does not focus on specific findings in audit reports and instead is principally interested in whether the Jail medical program continues to be accredited, so he would read the first few pages "and then . . . file them."  (*See id.* at 83-84, 140-141).

### E.     *Post-Incident Evidence*

Plaintiff further alleges that, subsequent to Mr. Jernegan's death, the Jail's medical / mental health policies did not change, which plaintiff asserts is additional evidence of a continuing practice of deliberate indifference towards inmate health and safety which has existed and continued without interruption since Sheriff Glanz took over the Jail in 2005.  In support of this contention, plaintiff cites certain reports and audits after Mr. Jernegan's death as reflecting a continuing lack of care for mentally ill inmates at risk of suicide.  One such report was completed following another audit by NCCHC in 2010.  After that audit, NCCHC placed TSCO on probation, after finding several serious deficiencies, including that "potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks.  Training for custody staff has been limited.  Follow up with the suicidal inmate has been poor."  (Doc. 232-35; *see also* Doc. 313-2).  Other significant concerns were identified.  (*See id.*).[9]

Following a 2011 audit by United States Immigration and the United States Department of Homeland Security Office of Civil Rights and Civil Liberties (CRCL), the CRCL "found a prevailing attitude among clinic staff of indifference," that "nurses are undertrained [and are not]

---

[9]     However, there is some evidence of improvement as to mental health screening and evaluation, as the Jail was found in compliance with the NCCHC standard relating to such screening and evaluation during the 2010 audit.  (*See id.* at 11).

documenting or evaluating patients properly," that "two ICE detainees with clear mental/medical problems . . . have not seen a doctor," and that, with respect to one inmate with "obvious mental health issues," a "TCSO nurse documented mental issues during intake but failed to refer to provider." (Doc. 232-37).

Despite serious medical deficiencies (including problems with mental health assessments and treatment) cited in the 2007 NCCHC report and all of the serious problems cited in the reports following Mr. Jernegan's death, the Sheriff continued to renew the health services contract, and he testified in 2012 that he would rate the medical staff performance as a 9 on a scale of 1 to 10, with 10 being the best. (Doc. 232-4 at 17). Plaintiff asserts that this is evidence that, regardless of continuing, systematic and serious deficiencies in the Jail medical and mental health system placing inmates like Mr. Jernegan at serious risk of harm, Sheriff Glanz has been and remains seriously and deliberately indifferent to such risks.

The Court has segregated this post-incident evidence within the evidentiary summary in light of a split of legal authority regarding the relevance of such conduct in § 1983 cases. Several courts have held that post-incident evidence can be relevant to an official's disposition and the policies and practices that existed on the date of the incident at issue. For example, in *Grandstaff v. City of Borger*, 767 F.2d 161, 170-71 (5th Cir. 1985), the Fifth Circuit held that "[t]he disposition of the policymaker may be inferred from his conduct after the events [claimed to constitute a constitutional deprivation]." In arriving at this conclusion, the court reasoned that, following the constitutional deprivation by police officers,

> there were no reprimands, no discharges, and no admissions of error. The officers testified at the trial that no changes had been made in their policies. If that episode of dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger. If prior policy had been violated, we would expect to see a different reaction. If what the officers did

> and failed to do . . . was not acceptable to the police chief, changes would have
> been made. . . . The policymaker's disposition, his policy . . . after [the incident]
> was evidence of his disposition prior to [that date].  As subsequent conduct may
> prove discriminatory motive in a prior employment decision, and subsequent acts
> may tend to prove the nature of a prior conspiracy, so the subsequent acceptance
> of dangerous recklessness tends to prove his preexisting disposition and policy.

*Id.* at 171 (citations omitted).

The Tenth Circuit cited the Fifth Circuit's *Grandstaff* opinion, with approval, in *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009).  *Cordova* involved a claim of excessive police force resulting in the shooting death of Mr. Cordova while fleeing from police in a car chase.  Among other things, Cordova's survivors claimed that the city that employed the officer involved in the shooting was liable under a § 1983 municipal liability theory.  The court found a genuine issue of fact as to whether a constitutional violation occurred, preventing summary judgment on that element of a municipal liability claim.  569 F.3d at 1193-94.  With respect to the second element (whether a municipal policy or custom was the moving force behind the constitutional violation), the plaintiffs claimed that the city's actions deviated from official policy "both in its training of officers and in failing to discipline [the officer] for his conduct."  *Id.* at 1194.  Analyzing the allegations relating to the city's failure to discipline the officer, the Tenth Circuit stated:

> As for any failure to discipline Officer Aragon, basic principals [sic] of linear
> time prevent us from seeing how conduct that occurs *after* the alleged violation
> could have somehow caused that violation.  A subsequent cover-up might provide
> circumstantial evidence that the city viewed the policy as a policy in name only
> and routinely encouraged contrary behavior, *see, e.g., Grandstaff v. City of
> Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("The disposition of the policymaker
> may be inferred from his conduct after the [violation occurred].ticity"), though that
> hardly seems to be the case here, since the County Critical Incident Team
> conducted a full investigation and the CCPD police chief simply called off a
> second investigation as being unnecessarily duplicative.  A failure to investigate
> or reprimand might also cause a future violation by sending a message to officers
> that such behavior is tolerated.  It does not, however, in and of itself constitute a
> causal connection in the immediate case.

*Id.*

20

The Ninth Circuit has similarly found that post-incident evidence may be probative with respect to the existence of a policymaker's custom or policy at the time of the incident:

> In holding that [witness declarations regarding similar jail treatment following the incident at issue] may be used to establish municipal liability although the events related therein occurred after the series of incidents that serves [sic] as the basis of Henry's claims, we reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry. . . . When a county continues to turn a blind eye to severe violations of inmates' constitutional rights – despite having received notice of such violations – a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference.

*Henry v. County of Shasta*, 137 F.3d 1372, 1372 (9th Cir. 1998) (amending prior opinion at 132 F.3d 512, 519 (9th Cir. 1997)).  The court also stated that, "[i]f a municipal defendant's failure to fire or reprimand officers evidences a policy of deliberate indifference to their misconduct, surely its failure even after being sued to correct a blatantly unconstitutional course of treatment [at the county jail] is even more persuasive evidence of deliberate indifference or of a policy encouraging such official misconduct."  132 F.3d at 520.

The First Circuit has also followed the logic of *Grandstaff* and held that "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."  *Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989) (affirming district court's admission of post-event evidence for purposes of § 1983 claims under relevance rules); *Foley v. City of Lowell, Mass.*, 948 F.2d 10, 14 (1st Cir. 1991) ("Contrary to the City's exhortation that the date an incident occurs marks the outside date for evidence-gathering on such an issue, we think that actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident.").  Without any significant legal analysis, the Third Circuit also found in one case that a post-incident complaint of excessive force "may have evidentiary value for a jury's consideration

whether the City and policymakers had a pattern of tacitly approving the use of excessive force." *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996).

In contrast to the First, Fifth and Ninth Circuits, the Seventh Circuit affirmed a magistrate judge's exclusion of evidence of an incident that occurred years after the conduct at issue, finding that the "[e]vidence of an incident that occurred years after the conduct in issue was properly excluded by the magistrate judge." *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994).[10]

The Court agrees with the analysis of the First, Fifth, Ninth, and Tenth Circuits with respect to relevance of certain post-incident conduct to municipal liability in a § 1983 case. Certain post-incident conduct may be relevant to the disposition of the Sheriff or the existence of a policy or custom at the time of Mr. Jernegan's July 2009 incarceration and death. Indeed, as noted by the Ninth Circuit, such evidence may be "highly probative" of such an inquiry because, "[w]hen a county continues to turn a blind eye to severe violations of inmates' constitutional rights – despite having received notice of such violations – a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference." *Henry*, 137 F.3d at

---

[10]     District courts have split on whether to admit (or to permit discovery of) post-incident evidence in a § 1983 case. *See, e.g., Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (agreeing with the logic of *Grandstaff* and *Henry* and concluding that subsequent events may reflect a tacit policy by the municipal policymaker); *Martinez v. Cornell Corrections of Texas*, 229 F.R.D. 215, 220 (D.N.M. 2005) (overruling objections to discovery of post-incident assaults, noting that such evidence "may be admissible to the existence of [defendant's] policy, custom, or practice."); *Dejesus v. Village of Pelham Manor*, 282 F. Supp. 2d 162, 176 (S.D.N.Y. 2003) (subsequent acts "are not probative of a prior municipal policy because they can not provide the necessary causal link between a custom or policy and the conduct at issue"); *Harvey v. Hankins*, 681 F. Supp. 622, 624 (W.D. Mo. 1988) (post-event evidence of other excessive force incidents were irrelevant because they did not show deliberate indifference to plaintiff's rights); *see generally Dunn v. City of Newton, Kansas*, 02-1346-WEB, 2003 WL 22462519 at *8 (D. Kan. Oct. 23, 2003) (citing conflicting authorities on the issue but not deciding the issue).

1372.  However, such evidence obviously cannot be used to show causation, given linear reality.

*See Cordova*, 569 F.3d at 1194.

> **F.      *TCSO Written Policies vs. Actual Practices at the Jail***

Sheriff Glanz argues that he cannot be held liable, either in an individual or an official

capacity, because he had certain written policies generally providing that the TCSO will train

personnel regarding suicide risk and prevention and will use measures to identify those with

mental health problems and those at risk of suicide.  (*See, e.g.*, Doc. 198-1, 198-4).  For example,

in 2005, the Sheriff issued a policy relating to "Suicide Prevention and Response," which

provides that the TCSO "will employ measures designed to identify prisoners at risk for suicide

attempts and will train detention staff in responding to situations where prisoners display suicidal

risk factors.  Detention staff will also be trained in responding to suicide attempts and incidents."

(Doc. 198-1).  That policy includes a "Procedure" that "Medical Staff screens all prisoners upon

admittance to the Housing Unit" and "booking area officers will be observant for signs or

warning indicators of suicide risk and take preventative measures if necessary."  (*Id.* at 2).  In

addition, "[u]pon observation of any signs of mental health problems, detention staff will

immediately notify the shift Sergeant . . . [who] will notify the mental health staff of the situation

and document the observations in the unit log book."  (*Id.*).  In that situation, the "mental health

staff will [then] conduct an interview with the prisoner to determine whether the prisoner

requires placement on immediate suicide watch, mental health observation, or can be returned to

the Classification Unit for pod assignment."  (*Id.*).

Another policy provides that "[p]od officers will observe all inmates for any indication of

mental health problems and will make a notation in the unit log book and inform the housing

sergeant and medical staff if they notice any [of several outward signs of mental health

23

problems].”  (Doc. 198-4 at 3).  The TCSO policies also direct that the “classification officer will privately interview each inmate as the inmate is admitted for housing within the facility . . . to determine . . . [several points of information including] History of mental illness.”  (Doc. 198-5 at 1-2).  As part of the cell classification / assignment policy, “[i]nmates with a history of suicide attempts or threats will be placed in a two-person cell with high supervision housing regardless of their security score, pending further review and evaluation by the mental health staff.”  (*Id.* at 4).  After assignment to a particular pod and cell, “[r]easons to move an inmate include . . . [that the] inmate develops mental problems.”  (*Id.* at 5).  Another policy requires that intake booking information will be recorded for every inmate and such information shall include “[h]ealth status, including any current medical or mental health needs.”  (Doc. 198-6 at 5).  “A mental health screening form will be completed by the floor officer” and the inmate “will then be sent . . . to await . . . medical screening by the medical staff and processing to either housing or release.”  (*Id.* at 6).  TCSO policies also require training for “professional and support employees, including contractors, who have regular or daily contact [with inmates],” which includes training relating to “[s]igns of suicide risk” and “[s]uicide precautions.”  (Doc. 198-7 at 5).  “New health care employees” also receive orientation training (*id.* at 6), but that subdivision of the policy does not specifically reference suicide or mental health training (*see id.*), and new detention officers receive training relating to “[s]uicide intervention / prevention.”  (*Id.*).

In contrast to these written policies provided by the Sheriff, plaintiff provided evidence that the actual long-standing practices at the Jail did not include segregation of mentally ill inmates for observation, referral, or treatment.  For example, Nurse Mason (who worked as a nurse at the Jail from March 2009 to October 2010) asserts that “[a]s a matter of practice at the Jail, inmates who indicated that they had serious mental health disorders in booking would not be

referred for an assessment by the mental health team unless they explicitly stated that they were suicidal," and "[i]nmates who indicated serious mental health disorders at booking were never placed in an area for more frequent observation, unless they explicitly stated that they were acutely suicidal." (Doc. 232-3 at 4, ¶ 16). The treatment of Mr. Jernegan on each of three separate Jail visits over the course of seven months in 2009 further supports Ms. Mason's assertions as to what the actual practices were at the Jail in that time-frame. During those Jail bookings over seven months, he reported to Jail intake staff that he had been diagnosed as a paranoid schizophrenic (May and July 2009 bookings), and that he was actively paranoid, hearing voices or seeing things (all three bookings in 2009), but he was placed in general population each time. Even after he reported during intake in January 2009 that he had previously attempted suicide, had been feeling nervous or depressed, was experiencing paranoia, hearing voices or seeing things, he was still not treated any differently than any other inmate and was thus placed in general population. (*See* 232-6, 232-7).

Mason also alleges that there were significant delays in the assessment and treatment of inmates with serious mental disorders, and "[i]t was not uncommon for inmates to have to wait six (6) to seven (7) days to be seen by the mental health team after making a request for mental health treatment." (Doc. 232-3 at 4-5, ¶ 17). Many times, "requests for mental health care were ignored for days due to the cumbersome kiosk process and the failure of [medical personnel] to triage, or prioritize, mental health requests in a timely manner." (*Id.*). "There was constant turnover of medical personnel at the Jail," which resulted in the inability to "keep up with inmate demands for care," and the turnover resulted in a lack of adequate training for new medical staff. (*Id.* at 5, ¶ 18). As a result of these problems, it was "impossible for [new medical staff] to respond to sick calls in a timely manner." (*Id.*).

According to another witness, Tammy Harrington, who was a nurse at the Jail from October 2007 until March 2012, "[d]uring [her] entire tenure at the Jail, the Mental Health Team was understaffed and overwhelmed." (Doc. 232-1 at 4, ¶ 10). The Jail had approximately 1700 inmates, many with serious mental health problems, but there were only two full-time counselors, and "[i]t was impossible for the Mental Health Team to respond to requests for assistance in a timely manner." (*Id.*). Dr. Harnish, the *only* Jail psychiatrist, was at the Jail part-time. He "spent most of his time trying to get caught up on prescriptions, and had very little time to actually see the inmates" and "rarely saw patients because he was so overwhelmed." (*Id.*).

There were long delays in inmates being seen by the Mental Health Team. (*Id.*). "Despite the inadequate mental health staffing and delays in treatment, inmates with serious, even emergent mental health needs were rarely referred to mental health professionals outside of the Jail." (*Id.* at ¶ 13). "Even after inmates unsuccessfully attempted to commit suicide, they were kept inside the Jail." (*Id.*). "Inmates in need of urgent or emergent medical assistance for injuries, illness, or mental health issues were not seen for days - - and sometimes weeks - - due to the Jail's practices relating to triage." (*Id.* at 5, ¶ 14). The Jail's kiosk system, for inmates to submit requests for medical or mental health attention, worked only about 60% of the time. (*Id.*). Contrary to the Oklahoma Jail Standards requiring triage of such requests within 24 hours, medical staff at the Jail would not perform timely triage and would instead provide "canned" and "boilerplate" responses to such requests stating that someone would see the inmate within 24-48 hours, and "by design, the kiosk system provided these boilerplate, canned written responses as a façade." (*Id.*). "There was no one at the Jail who actually evaluated and prioritized the sick call complaints in a timely manner." (*Id.*). "It was impossible for the medical staff to actually triage the kiosk medical and mental health requests within 24 hours because we were so severely

understaffed . . . [and therefore] inmates were not actually seen in person to address their complaints and there was no way to know how critical the complaints were." (*Id.* at 5-6 at ¶ 15).

Nurse Harrington also asserts that the booking / intake process at the Jail was insufficient to provide adequate assessment of inmates' true medical and mental health needs. (*Id.* at 6, ¶ 16). The "TCSO emphasized quickly getting inmates through the booking process, as opposed to making sure that inmates were fully and adequately assessed," and TCSO would fine its medical services provider "for each inmate that took over two hours to get through booking." (*Id.*). According to Harrington, this "created an atmosphere under which the booking nurses rushed to get inmates through booking," with "very little actual assessment of medical or mental health needs." (*Id.*). As a result of the "superficial and rushed 'assessments'" during booking, there were "substantial risks that inmates with serious medical and mental health problems would not receive the treatment they needed in a timely manner." (*Id.*). "There was no accountability for the poor care being provided," and the "poor care was simply accepted by . . . TCSO as standard." (*Id.* at 8, ¶ 21).

## IV. Analysis of Plaintiff's § 1983 Claims

### A. *Individual Capacity*

Section 1983 "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution. . . .'" *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting 42 U.S.C. § 1983). A plaintiff may therefore establish § 1983 liability of a defendant-supervisor by demonstrating that "(1) the defendant promulgated, created,

implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.*

The Eighth Amendment "imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). "Under the Fourteenth Amendment due process clause, 'pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985)). A violation of such rights under the Eighth Amendment gives rise to a civil rights claim under 42 U.S.C. § 1983. *See Tafoya*, 516 F.3d at 916. Claims premised on jail suicide are treated as claims based on a failure of jail officials to provide medical care for jail inmates in their custody. *See Barrie v. Grand County*, 119 F.3d 862, 866 (10th Cir. 1997); *duBois v. Payne County Bd. of County Comm'rs*, No. 13-6144, 2013 WL 5952148, *4 (10th Cir. Nov. 8, 2013). Such claims are thus "judged against the 'deliberate indifference to serious medical needs' test of *Estelle v. Gamble*, 429 U.S. 97, 104 . . . (1976)." *duBois*, 2013 WL 5952148 at *4 (quoting *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994)).

"Deliberate indifference" is defined something more than negligence, and it requires knowing and disregarding an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court clarified that deliberate indifference has both objective and subjective components. *Wilson*, 501 U.S. at 298-99. The objective component is met if the harm

suffered is sufficiently serious.  *Id.*  The subjective component of the deliberate indifference test is met if a prison official knows of and disregards an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 104-05.

"To prevail on the subjective component, the prisoner must show that the defendant[] knew [he] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Martinez*, 563 F.3d at 1089; *see also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) ("The subjective component is satisfied 'if an officer knows of and disregards an excessive risk to [an inmate's] health or safety.'").  "The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." *Tafoya*, 516 F.3d at 916 (10th Cir. 2008) (emphasis in original); *see Farmer*, 511 U.S. at 843; *Layton v. Board of County Comm'rs of Okla. County*, 512 Fed. App'x 861 (10th Cir. Mar. 12, 2013) (quoting *Tafoya*); *duBois*, 2013 WL 5952148 at **4-5 (quoting *Tafoya*). "It does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk... for reasons personal to him or because all prisoners in his situation face such a risk." *Tafoya*, 516 F.3d at 916 (quoting *Farmer*, 511 U.S. at 843). "[A] jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Tafoya*, 516 F.3d at 916.

Sheriff Glanz concedes that plaintiff can satisfy the objective component of the deliberate indifference claim, because of the seriousness of the harm to Mr. Jernegan – death.  (Doc. 198 at 22).  Hence, only the subjective prong of the deliberate indifference standard is at issue here. Glanz asserts that plaintiff cannot satisfy the subjective component, because plaintiff has not established an underlying constitutional violation by proof that Jail personnel had and

disregarded "*actual knowledge of the imminent, substantial and specific risk of suicide by Charles Jernegan*." (*See* Doc. 255 at 7 of 12; *see also* Doc. 198 at 12-20). Sheriff Glanz argues that plaintiff has to prove at the summary judgment stage that jail personnel recklessly disregarded an "imminent, substantial and specific risk of suicide" presented by Mr. Jernegan. This overstates the applicable standard. In a recent case, the district court granted summary judgment in a jail death case because "there simply is no evidence from which any reasonable jury could find that on April 28, 2009, [the deceased jail detainee] faced death. Thus, it cannot be said that anyone recognized that risk existed and recklessly ignored it." *Layton*, 512 Fed. App'x at 870. Rejecting that approach, the 10th Circuit explained:

> We respectfully disagree with the district court's analysis. To survive summary judgment, [plaintiffs] did not need to provide evidence that "on April 28, 2009, Mr. Holdstock faced death." *Instead, [plaintiffs] merely needed to present evidence that Mr. Holdstock faced a substantial risk of serious harm of which the prison officials were, or should have been, aware*. . . . "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including *inference* from circumstantial evidence." *Here, we conclude that [plaintiffs] have raised a triable issue of material fact regarding whether Sheriff Whetsel was aware of dangerous prison conditions which were substantially likely to result in constitutionally deficient medical care for seriously ill detainees. Furthermore, a reasonable jury could infer that Mr. Holdstock's death was, in fact, caused by these dangerous conditions.* Therefore, insofar as the district court found that [plaintiffs] could not survive summary judgment regarding the existence of a constitutional violation – the first step in the municipal liability analysis – we conclude that the court erred.

*Id.* (citations omitted) (emphasis added).

Similarly, in *duBois*, a case involving a jail suicide, the court expressly noted that, to be liable under § 1983, the official need *not* be aware of a substantial risk of harm to a *particular inmate* or have knowledge of the *particular manner* in which the injury might occur. 2013 WL 5952148 at *5 (quoting *Tafoya*, 516 F.3d at 918). Instead, a jury may infer that a prison official had actual knowledge of the constitutionally infirm condition based on circumstantial evidence,

such as the obviousness of the condition or evidence that the jail official was aware of systemic deficiencies in the medical care system that were likely to result in constitutionally deficient medical care. *Id.* at *5; *see also id.* at *6 and n.3.[11]

In further support of his summary judgment argument, the Sheriff cites *Martinez v. Beggs*, 563 F.3d 1082 (10th Cir. 2009), as well as cases from the Seventh Circuit. In *Martinez*, an inmate died in the Cleveland County, Oklahoma jail a few hours after he was arrested for public intoxication. 563 F.3d at 1084. The evidence revealed that the inmate, who was acutely intoxicated upon booking at the jail, died from a "[s]udden heart attack due to coronary artery disease," that the "death was caused by heart attac[k] rather than acute alcohol intoxication," but that the medical examiner and plaintiff's expert indicated that the inmate's intoxication could have contributed. *Id.* at 1084, 1087. The arresting officers knew before arresting him that he was reportedly an alcoholic and that he had consumed "a lot of alcohol" and was generally acting belligerently. *Id.* at 1085. The inmate complied with a request that he kneel for removal of his handcuffs once in the cell. He was found dead approximately three hours later. *Id.* at 1086-87. The district court granted summary judgment to the defendants after determining that there was "no evidence in the record of any symptoms or signs indicating that [the inmate] would suffer

---

[11]     In *duBois*, the Tenth Circuit affirmed the district court's grant of summary judgment to the defendant sheriff. 2013 WL 5952148. That case is distinguishable for a number of reasons. Significantly, in *duBois*, there was *no evidence* of any systemic deficiencies in the medical system at the Jail. *Id.* at fn.3. As is further explained in this Opinion and Order, Ms. Cox has presented evidence supporting her claim of systemic deficiencies in the screening, evaluation, and treatment of mentally ill Jail inmates like Mr. Jernegan. In addition, in *duBois*, there was no evidence of any policy that would have enabled the inmate's suicide, and the court noted that the jail "had policies and practices in place to provide adequate medical care for all inmates" and that "[t]hose *policies were followed* in [duBois's] case." *Id.* at *7. In contrast, plaintiff here has presented evidence in this summary judgment record of widespread practices of not referring mentally ill inmates for further evaluation, not segregating them from the general population, and not timely responding to mental health requests, as well as evidence that written policies and Oklahoma Jail Standards were *not* followed with respect to Mr. Jernegan.

from a heart attack." *Id.* at 1090.  The Tenth Circuit Court of Appeals agreed with the district court and determined that, while the officers knew that he was intoxicated, "[plaintiff] has not presented evidence to create an issue of material fact regarding the defendants' subjective disregard of [the inmate's] risk of heart attack or death." *Id.* at 1089-90 and n.8.

  The court in *Martinez* cited *Estate of Hocker v. Walsh*, 22 F.3d 995 (10th Cir. 1994) in support of the court's determination that the "subjective component requires the prison official to disregard the risk of harm claimed by the prisoner."  563 F.3d at 1089.  In *Hocker*, the inmate was first detained while intoxicated and at times incoherent.  She was initially held in the receiving section of the Jail, which consists of an open area with six individual cells, all in complete view of detention officers, which was consistent with the jail's policy of placing intoxicated individuals in the receiving area "so that they can be closely monitored until they are sufficiently sober to enter . . . general population or are bailed out."  22 F.3d at 997.  She was finally sober enough to be processed, even though she remained somewhat intoxicated, and she was released hours later to make an initial court appearance on criminal charges.  Later that evening, after returning to the jail from court, she was moved to a general population cell.  The next afternoon, an attorney talked to the inmate in the visitation area of the jail.  An hour and a half later, she was found dead, hanging in her cell with a towel around her neck.  22 F.3d at 996-97.  The district court granted the defendants summary judgment.  The Tenth Circuit affirmed, concluding that there was no evidence supporting the plaintiff's claim that the inmate was "unconscious" upon admission to the jail.  *Id.* at 1000.  The court also determined that: "No facts suggest that [jail] staff had knowledge of the specific risk that [the inmate] would commit suicide.  Nor do the facts suggest that [her] risk of suicide was so substantial or pervasive that knowledge can be inferred." *Id.*

The evidence presented here is meaningfully different from *Martinez* and *Hocker* in several ways.  In *Hocker*, there was no evidence whatsoever of any prior knowledge of a risk of suicide, and there was no nexus between intoxication and suicide.  In contrast, here, construed in the light most favorable to plaintiff, the evidence indicates that Jail staff knew or had reason to know, that Mr. Jernegan: (1) reported anxiety and panic attacks; (2) during two of three Jail bookings / intakes in seven months, reported that he was paranoid schizophrenic; (3) reported during the July 2009 booking / intake just before his death that he was currently feeling paranoid, hearing voices or seeing things, that he had felt nervous or depressed for a few weeks, and he was paranoid schizophrenic; and (4) approximately 45 hours before he was found hanging from a bed sheet in his cell, he requested mental health help for problems, but there was no mental health visit during the two days that followed.

Moreover, in *Hocker*, consistent with the Jail's policy, the inmate had been segregated for some time in the general receiving area, in full view of detention officers, "so that [such intoxicated inmates] can be closely monitored until they are sufficiently sober to enter . . . general population or are bailed out."  22 F.3d at 997.  Here, the evidence reflects that Mr. Jernegan was placed in general population of the Jail, without any referral for further mental health evaluation, despite reporting that he was paranoid schizophrenic and actually experiencing paranoia and/or hallucinations and notwithstanding the fact that, based upon his answers to three of six questions on the Mental Health Screening, he should have been referred for mental health evaluation.  The failure to refer him for mental health evaluation is consistent with the established practice at the Jail (according to Nurse Mason) of not referring even obviously mentally ill inmates unless they admitted to being suicidal.

At oral argument, counsel for the Sheriff also relied heavily upon the Seventh Circuit's decision in *Collignon v. Milwaukee County*, 163 F.3d 982, 990 (7th Cir. 1998). *Collignon* is completely inapposite. There, the detainee was released from jail and returned to the home of his father and stepmother. Thereafter, he committed suicide at a hotel. The court thus found that the plaintiffs "cannot base their claims on the assertion that [the doctor or county] had an obligation to stop the detainee from committing suicide once he had been released from the jail." *Collignon*, 163 F.3d at 987. In contrast, Mr. Jernegan remained in the care and custody of the TCSO at the Jail and committed suicide while in custody.

The Sheriff argues that his staff should not be required to review information from prior Jail visits and that failure to do so is not a deprivation of constitutional rights. Even disregarding the medical records from Mr. Jernegan's Jail visits in the months prior to the July 2009 incarceration, there is sufficient evidence in the record to present "a triable issue of material fact whether Sheriff [Glanz] was aware of dangerous prison conditions which were substantially likely to result in constitutionally deficient medical care for seriously [mentally] ill detainees," that he was deliberately indifferent to such conditions, and that Mr. Jernegan's "death was, in fact, caused by these dangerous conditions." *See Layton*, 512 Fed. App'x at 870; *see also Tafoya*, 516 F.3d at 921 (finding plaintiff had "presented evidence of disputed material facts sufficient to create a genuine question as to whether Sheriff Salazar was deliberately indifferent to the conditions" at the jail).

Plaintiff has presented evidence that the Sheriff participated in a meeting, before the 2007 NCCHC audit, at which Jail medical staff were instructed to hide problem medical records of inmates and that the Sheriff said that "heads were going to roll" if the audit did not go well. A reasonable jury could infer from that evidence that the Sheriff had actual knowledge of serious

problems with the Jail's medical care.  Thereafter, the 2007 audit findings stated that "health needs identified during receiving screening are not addressed in a timely manner," that "follow up of inmates with mental health needs is not of sufficient frequency to meet their needs" and that, "[o]nce mental health issues are identified: 1, there was no consistent follow up by the mental health staff; 2, not everyone taking psychotropic medications had been scheduled for a follow-up evaluation; and 3, there was a noted delay in responding to routine mental health-related requests submitted by the inmates." (Doc. 232-31 at 7, ll. 17-23, at 62, ll. 4-17). Despite those findings, Sheriff Glanz could identify no changes in Jail practices following the 2007 audit findings, and plaintiff presented some evidence that the defects noted by the NCCHC in 2007 were never addressed and that practices in medical care did not change at the Jail. (Doc. 232-32 at 5 of 7).

The inference that certain serious problems were never addressed following the 2007 audit is further supported by the 2011 findings of the United States Department of Homeland Security that there was "a prevailing attitude among clinic staff of indifference," that "nurses are undertrained [and are not] documenting or evaluating patients properly," that "two ICE detainees with clear mental/medical problems . . . have not seen a doctor," and that a "TCSO nurse documented mental issues during intake but failed to refer to a provider." (Doc. 232-37). A jury could find that these continuing failures (after the 2007 NCCHC findings and OSDH findings of similar problems with respect to Mr. Jernegan's death) to properly segregate and refer mentally ill inmates for further mental health evaluations demonstrate continuing practices of deliberate indifference toward significant risks to the health and safety of mentally ill inmates.

Even were the Court to disregard the post-incident evidence in this analysis, the evidence of a failure to respond to problems identified in the 2007 NCCHC audit (which predated Mr.

Jernegan's death), coupled with evidence of an established practice of failing to timely evaluate, segregate, or respond to mental health requests of mentally ill inmates, presents facts from which a jury could infer that Sheriff Glanz had actual knowledge of a constitutionally infirm condition at the Jail.  Thus, even without reliance upon the evidence after Mr. Jernegan's death, the Court has identified a number of material fact disputes preventing the entry of summary judgment.

As noted above, Sheriff Glanz cites a number of written policies and training materials as evidence that he cannot be found to have been deliberately indifferent to a serious risk of harm to inmates such as Mr. Jernegan.  However, "the existence of written policies of a defendant are [sic] of no moment in the face of evidence that such policies are neither followed nor enforced." *Ware v. Jackson County, Mo.*, 150 F.3d 873, 882 (8th Cir. 1998); *see also City of St. Louis v. Praprotnick*, 485 U.S. 112, 131 (1988) ("Refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced."); *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000) ("a 'paper' policy cannot insulate a municipality from liability where there is evidence . . . that the municipality was deliberately indifferent to the policy's violation").

The evidence submitted in this case creates genuine issues of material fact as to whether and to what extent the written policies were followed or enforced by the Sheriff and his Jail staff. For example, the instructions at the bottom of the Jail's Mental Health Screening Form were disregarded in that, despite qualifying for two separate bases for referral for a mental health evaluation, Mr. Jernegan was not referred, and the person entrusted with decision-making authority as to where to place him did not, as a matter of practice and custom, ever look at the Mental Health Screening Form, she disclaimed any real mental health training, and could not state whether paranoid schizophrenia is a serious mental illness.  A nurse at the Jail during the

relevant time frame reported that "the booking nurse would never refer an inmate to the mental health team unless the inmate expressly indicated that he was actively suicidal" and "[a]s a matter of practice at the Jail, inmates who indicated that they had serious mental health disorders in booking would not be referred for an assessment by the mental health team unless they explicitly stated that they were suicidal."   (Doc. 232-3 at ¶ 16).   While the written policies provide that TCSO will administer the mental health screening form and will use efforts to identify persons at risk for suicide and will take precautions and be observant for signs of suicide risk or mental illness, the evidence presents a question for the jury as to whether the *actual* policy, practice and custom was different from the written policies with respect to whether there were in fact any measures in place to protect mentally ill inmates from a risk of serious harm.

Moreover, although written policies provide that booking officers will be observant for suicide warning indicators, shall administer a mental health screening form, shall consider "a history of mental illness," and shall notify the shift sergeant of any signs of mental illness, those written policies are meaningless if they are not enforced or the system is in reality designed to ignore such warning signs.   The Sheriff's argument is hinged heavily upon the fact that Mr. Jernegan reported that he was not suicidal at the time of booking, but one of the very forms upon which he relies would require prompt referral for mental health evaluation, and Jernegan *did report* a history of diagnosed mental illness (paranoid schizophrenia), that he was experiencing hallucinations, and that he needed medication for mental illness, but there was no referral, no further evaluation, and he was placed in the general population at the Jail.

There is also evidence that the Jail intake system was designed such that the person with responsibility to classify inmates for booking would not even review the mental health screening form and would be more concerned with rushing inmates through intake than properly screening

for actual suicide risk or serious mental illness. The "TCSO emphasized quickly getting inmates through the booking process, as opposed to making sure that inmates were fully and adequately assessed," and TCSO would fine its medical services provider for any inmate who took longer than two hours to process, which "created an atmosphere under which the booking nurses rushed to get inmates through booking," with "very little actual assessment of medical or mental health needs." (Doc. 232-1 at 6, ¶ 16). As a result of the "superficial and rushed 'assessments'" during Jail bookings, there were "substantial risks that inmates with serious medical and mental health problems would not receive the treatment they needed in a timely manner" or, if ever, as in Mr. Jernegan's case. (*Id.*).

Robin Mason, a Jail nurse, provided a sworn affidavit stating that she observed inmates who would have to wait six or seven days before a visit from mental health personnel after making a request for mental health treatment. (Doc. 232-3 at ¶ 17). A *written* policy (requiring detention staff to immediately react to signs of mental health problems so that mental health staff can interview the inmate and determine whether the inmate requires suicide watch or mental health observation) is meaningless if the *actual* established practice permits days to pass without *any* mental health visit to an inmate actually reporting mental health problems. In the case of Mr. Jernegan, a paranoid schizophrenic inmate who reported hallucinations, nervousness and anxiety, who reported that he was taking medication for his mental illness, there was no visit at any time during the 45 hours between his kiosk report of mental health problems and being found hanging from a bed sheet in his general population cell.[12] As noted by the AMS review of

---

[12]     If the responses to Mr. Jernegan's kiosk reports are an accurate indication of the actual policy and practice at the Jail, persons reporting mental health problems on a Tuesday or Wednesday may not be seen by a mental health team member until the following Monday. (Doc. 198-18) ("Please give 48-72 hours from time this was received to be seen, excluding Weekends and Holidays. . . .").

Mr. Jernegan's death, "[i]f this inmate had wished to express a suicidal ideation, there is potential for it to be missed during a 2 day period."  (Doc. 233-1 at 6 of 7).

Sheriff Glanz recognizes that the Jail is required to comply with the Oklahoma Jail Standards, which he considers to be the "bare minimum" requirements for inmate care at the Jail. (Doc. 232-4 at 10, ll. 1-12).  However, the OSDH found that the "policy used by [the Jail's medical care provider was] in direct conflict with the Oklahoma Jail Standards."  (*See* Doc. 232-20).  Also, even though the OSDH found the Jail violated the standards with respect to Mr. Jernegan, the Sheriff's position, as stated by his counsel at oral argument, is that his Jail staff "did it correctly" as to the care of Mr. Jernegan.  Viewing the evidence in the light most favorable to plaintiff, the Court concludes that there are triable issues of material fact as to whether the TCSO written policies were the actual policies, whether they were followed or enforced, and whether the Jail's personnel were properly trained to identify and segregate mentally ill inmates who may be at risk of suicide.  *See Ware*, 150 F.3d at 882; *Praprotnick*, 485 U.S. at 131; *Daskalea*, 227 F.3d at 441.

The same evidence presents issues of material fact regarding whether Sheriff Glanz was on notice of constitutional deficiencies in the care of mentally ill detainees and whether his failure to take appropriate measures to remedy those deficiencies constituted deliberate indifference.  *See, e.g., Layton*, 512 Fed. App'x at 871-72.  The Sheriff was notified of problems with the mental health system and delays in handling medical and mental health requests in 2007, but he could not identify any changes made in the mental health system at the Jail following the 2007 NCCHC report of deficiencies.  This evidence could support a finding of deliberate indifference to a deficient medical system with respect to mentally ill inmates.  Even more troubling are the allegations that the Sheriff was present with his Undersheriff at a meeting

prior to the 2007 NCCHC audit at which staff were advised to hide problem jail medical records and to otherwise interfere with the audit.  If such evidence is believed, the jury could infer, from that meeting alone, that Sheriff Glanz was aware of vast problems with the Jail's medical care system such that there was a concern as to whether the Jail would pass the audit.

There is also some evidence supporting plaintiff's allegation of a direct causal link between the Sheriff's alleged inaction and the deprivation of Mr. Jernegan's right to receive adequate medical care, including mental health services and intervention which would have prevented his death.  *See Layton*, 512 Fed. App'x at 872.  It may be inferred from the evidence (construed in the light most favorable to plaintiff) that, had there been any adequate component of mental health care provided during his incarceration in July 2009, his death would have been prevented.  For example, his suicide may have been prevented if: (1) he had been treated in accordance with the "bare minimum" standards identified in the Oklahoma Jail Standards; (2) he had been referred for mental health evaluation based upon his reports at booking; (3) the Jail staff had segregated him from the general population and placed him in an area of more frequent observation until he received further mental health evaluation; (4) he had received any mental health treatment or medications; or (5) Jail staff had visited him to evaluate his risk of suicide at any time within the 45 hour period between his kiosk report of mental health problems and staff finding him hanging from a bed sheet in his cell.

### B.      Official Capacity Claim

A claim against a government actor in his official capacity "is essentially another way of pleading an action against the county or municipality" he represents, and is considered under the standards applicable to 42 U.S.C. § 1983 claims against municipalities or counties. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).  To hold a county / municipality liable under §

1983, a plaintiff must demonstrate (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "that there is a direct causal link between the policy or custom and the injury alleged").  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

"When an officer deprives a citizen of a constitutional right, municipal governments may incur liability under § 1983 when 'the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."  *Olsen*, 312 F.3d at 1317-18 (quoting *Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 690 (1978)).  A municipal entity may be held liable for an act it has officially sanctioned, or for the actions of an official with final policymaking authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482-83 (1986); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127-28 (1988).  "The failure to remedy ongoing constitutional violations may be evidence of deliberate indifference on the part of a municipality."  *Layton*, 512 Fed. App'x at 871.  In addition, "continued adherence to an approach that [municipal decision makers] know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability.'"  *Board of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (citations omitted).

The Tenth Circuit has described several types of actions which may constitute a municipal policy or custom:

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice

that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson*, 627 F.3d at 788 (citations omitted).

The same evidence that precludes summary judgment on plaintiff's claim against Sheriff Glanz in his individual capacity also prevents summary judgment on the claim against the Sheriff in his official capacity.  As noted, there are genuine disputes of material fact as to whether there was a constitutional violation and whether there were settled, widespread practices at the Jail which amounted to a custom which was the moving force behind a violation of Mr. Jernegan's constitutional rights.[13]  *See Bryson*, 627 F.3d at 788.  In summary, even after the 2007 NCCHC reports of problems with mental health care and delays in medical triage after reports from inmates, there is evidence of a continuing failure of Jail staff to timely respond to inmate problem reports.  The evidence also supports plaintiff's allegations that, as a matter of established practice at the Jail, mentally ill inmates like Mr. Jernegan would have to wait for days before being seen by any mental health personnel, and mentally ill inmates were not being properly classified or identified at booking as in need of mental health evaluation.  According to certain Jail nurses, the TCSO focused heavily on rushing inmates through intake, rather than properly evaluating their medical / mental health needs or risks, and TCSO fined its medical provider for any inmates who were not processed through intake in two hours or less.  Such continuing practice of placing mentally ill inmates in the Jail's general population, without

---

[13]     See the analysis and citations above (in Sections III.F through IV.A) regarding evidence relating to alleged *actual* customs or practices rising to the level of official policy.

access to mental health evaluation and treatment and without any timely response to requests for mental health services, could be found to be the moving force behind Mr. Jernegan's death by suicide.

The Court thus concludes that plaintiff has raised several triable issues of material fact relating to whether there existed municipal policies or customs of placing seriously mentally ill inmates in general population and failing to timely respond to mental health requests which would place mentally ill inmates at serious risk of harm.  In addition, a reasonable jury could infer that Mr. Jernegan's death was, in fact, caused by such policies or customs.

IT IS THEREFORE ORDERED that the defendant's Motion for Summary Judgment (Doc. 198) is **denied**.

IT IS SO ORDERED this 7th day of March, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE