# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CAROLYN COX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11-CV-457-JED-FHM** |
| **v.** | ) | |
| | ) | |
| **STANLEY GLANZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court are (1) plaintiff's Motion in Limine to Preclude Expert Testimony of [defendant's expert] witness, Arthur W. Rousseau (Doc. 191) and (2) plaintiff's Motion in Limine (Doc. 199).  These motions present certain overlapping issues.  Defendant Stanley Glanz filed a Response in opposition to Doc. 199 (Doc. 215) and, with the Court's permission (Doc. 310), he filed an out of time Response (Doc. 311) to Doc. 191, which adopted the previously-settled defendants' Response (Doc. 213).  Plaintiff filed a Reply in support of Doc. 199 (Doc. 239).  The Court has previously summarized the factual background of this case in prior orders. *See* in particular the Court's Opinion and Order (Doc. 321) filed March 7, 2014.

## I.    Motion to Preclude Expert Testimony

### A.    *Standards Governing Expert Testimony*

Rule 702 of the Federal Rules of Civil Procedure applies to the admissibility of expert testimony.  The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 597 (1993), the Supreme Court held that district courts act in a "gatekeeping role" to ensure that scientific expert testimony is relevant and reliable.  An expert's opinion must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  The applicability of *Daubert* was later expanded to apply to the opinions of all experts, not just scientific experts. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("We conclude that *Daubert's* general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").

The Supreme Court set forth several non-exclusive factors that a court may consider in making its determination whether proposed expert testimony will assist the trier of fact: (1) "whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) the "known or potential rate of error" of a technique; and (4) whether the theory or technique has "general acceptance," which is an important consideration because "'a known technique which has been able to attract only minimal support within the community' may properly be viewed with skepticism." *See Daubert*, 509 U.S. at 593-94.  The inquiry into these factors is "a flexible one," and the focus is "on principles and methodologies, not on the conclusions that they generate." *Id.* at 593

In *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227 (10th Cir. 2005), the Tenth Circuit discussed the role of district courts when considering a *Daubert* challenge.  The court should make a preliminary finding whether the expert is qualified, by determining "if the expert's proffered

2

testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" 400 F.3d at 1232-33 (quoting *Daubert*, 509 U.S. at 592). The proponent of expert testimony must establish that the expert used reliable methods to reach his conclusion and that the expert's opinion is based on a relevant factual basis. *See id.* at 1233. "[A] trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." *Id.* However, an impermissible analytical gap in an expert's methodology can be a sufficient basis to exclude expert testimony under *Daubert. See id.*; *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005). "Neither *Daubert* nor the Federal Rules of Evidence 'require[ ] a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.'" *Norris*, 397 F.3d at 886 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

     B.     *Dr. Arthur Rousseau's Opinions*

The Motions at issue both relate generally to opinions of Dr. Arthur Rousseau, who has been listed as an expert witness by defendant. Dr. Rousseau is a psychiatrist who has examined Jail records, as well as audiotaped phone calls made by Mr. Jernegan while he was incarcerated at the Jail before he hung himself from a sheet in his cell in the Jail's general population. His opinions include the following:

> Within a medical probability, Mr. Jernegan was not suffering from a mood disorder such as Major Depressive Disorder during the three incarcerations at [the Jail]. More specifically, during Mr. Jernegan's incarceration in July 2009, phone conversations were recorded that allow one to further assess Mr. Jernegan's mood and mental status. During the seven phone conversations, Mr. Jernegan never spoke of suicidal thoughts. . . .

> I also do not consider Mr. Jernegan to have a thought disorder such as Paranoid Schizophrenia as he documented [by reports to Jail personnel] on July 29, 2009. In reviewing the audio CD of Mr. Jernegan's telephone conversations, it is clear that he was oriented to time, person, place and present situation. . . .

It is also within a medical probability that Mr. Jernegan fulfills the diagnostic criteria for an Axis II diagnosis of Antisocial Personality.  [Three of seven listed criteria must be fulfilled for a person to be so diagnosed.]   Although Mr. Jernegan's past psychiatric history is not available, the provided information illustrates that Mr. Jernegan fulfills more than the required three of seven criteria for Antisocial Personality. . . . Mr. Jernegan a. Was involved in a sexual relationship with a fourteen or fifteen year old female; b.  Encouraged this young girl to sell drugs so that he could have money for his personal use; c. Was aware that his girlfriend used drugs because it was the only way she could be with him when he used them; d. Made comments that he could not sexually satisfy his girlfriend and suggested multiple-partner sex; and e.  Wanted others to make third party phone conferences even though he knew it was against the rules.

Based on the medical probability of Mr. Jernegan having a Personality Disorder, one must also take into consideration that Mr. Jernegan was not always being truthful in his self-reports regarding his mental health.  For example he states that he was being treated for Paranoid Schizophrenia.

With regard to Mr. Jernegan's suicide, it is within a medical probability that Mr. Jernegan did not want to die, but wanted to be segregated from the cell population and saw that a "suicide attempt" could achieve this goal.  In clinical terms, this is referred to as a "failed parasuicide." . . . It is within a medical probability that Mr. Jernegan was attempting a parasuicide.   Mr. Jernegan gave no indication nor displayed any symptoms that he was depressed, or expressed any suicidal thoughts to [the Jail or nursing staff], fellow prisoners or his family.

In summary, it is my opinion that [the Jail and medical staff] provided adequate mental health care to Mr. Jernegan, that his parasuicide was not foreseeable to anyone, and that there was no negligence or deliberate indifference on the part of the facility or the individual staff members.

(Doc. 213-1).

Plaintiff asserts that Dr. Rousseau's opinions are unreliable because they are based on pure speculation, lack any factual, clinical, or scientific support, are not supported by any peer-reviewed literature or any other source material, and are not relevant because they are based on telephone calls that played no role in the mental health treatment (or lack thereof) of Mr. Jernegan while at the Jail.

Based upon applicable *Daubert* standards, the Court finds that Dr. Rousseau's opinions are not based upon a relevant factual basis or reliable methodology and would not be of

assistance to the jury.  Defendant has not specifically described Dr. Rousseau's methodology.  It appears to the Court that his basic methodology involved diagnosing Mr. Jernegan – a deceased person whom Dr. Rousseau never saw or examined as a patient or even met – with Antisocial Personality Disorder.  That was apparently gleaned from being advised of prior arrests and listening to a limited number of audio-recorded telephone calls made by Mr. Jernegan while at the Jail.  The defendant has not provided any information to support a methodology of making a psychiatric diagnosis of mental condition based solely upon listening to audio recordings of telephone calls and/or obtaining an arrest record.  From his own conclusion that Mr. Jernegan "within a medical probability" had an Antisocial Personality, Dr. Rousseau then jumps to an unsupported suggestion that Mr. Jernegan "was not always being truthful in his self-reports regarding his mental health."  These opinions by Dr. Rousseau are further suspect and unreliable because, as he acknowledges, "Mr. Jernegan's past psychiatric history is not available."  The Court finds these opinions to be the type of unsupported speculation that *Daubert* prohibits. *Daubert*, 509 U.S. at 590.

From listening to the telephone calls, Dr. Rousseau also extrapolates that Mr. Jernegan did *not actually commit suicide* when he hung himself from a sheet in his cell and subsequently died, but that he really committed a "*failed parasuicide*."  His analysis is essentially that: (1) Mr. Jernegan did not want to die, but only wanted to get attention, so he decided to hang himself from a sheet in his cell, with the intention that he would be found and saved; (2) but, he died, so he *failed* at what he intended to be only a fake attempted suicide to garner attention and perhaps a transfer from the general Jail population.  Thus, Dr. Rousseau concludes that "it is within a medical probability that Mr. Jernegan did not want to die, but wanted to be segregated from the cell population and saw that a 'suicide attempt' could achieve this goal."  (Doc. 191-1 at 3).  Dr.

Rousseau's methodology, again, appears to be determining, from a psychiatric standpoint, what Mr. Jernegan intended to be the consequence of hanging himself, based upon listening to some telephone calls Mr. Jernegan made prior to hanging himself.  Defendant has not provided any data, study, or other support for such a methodology, and the Court finds the analytical gap to be so wide that it is doubtful any such support exists.

Defendant supplied one article which purportedly supports Dr. Rousseau's methodology at reaching his conclusion relating to "failed parasuicide."  (Doc. 213 at 5; Doc. 213-1).  That article very generally summarizes certain literature on the "Epidemiology of Parasuicide." (Doc. 213-1).  The article, itself, recognizes "*methodological problems* [which] constitute a major limitation in interpretation of the results," and "*methodological inconsistencies* across studies." (*Id.*).  The article also notes that there have been "*widely differing methodologies* between studies," that parasuicide, defined broadly, "includes both suicide attempts and deliberate self-harm inflicted with no intent to die," and that the term "has been inconsistently interpreted." (*Id.*) (emphasis added).  There is no standardization of "[o]utcome variables and assessment procedures," and the "sources of information for studies on parasuicide are inadequate."  (*Id.*).  Beyond these factors, which do not reflect a reliable methodology for diagnosing "failed parasuicide," the article is focused on analyzing information principally derived from responses to survey questions posed to people *who had not died* and thus could report their intent (*see id.*).  The article provides no application which might bolster the "methodology" used by Dr. Rousseau to arrive at his theory that Mr. Jernegan's death was possibly a "failed parasuicide."

Finally, it is noteworthy that the one and only article provided in support of his methodology actually somewhat undermines his conclusions.  For instance, while Dr. Rousseau opines that Mr. Jernegan's reports of being paranoid schizophrenic and nervous / depressed may

have been untruthful and that he really intended to commit parasuicide (not suicide), the article provided by defendant reports that "[t]here is some evidence that having a mental disorder is a risk factor for parasuicide.  The most frequent diagnoses are mood disorders, and especially depression.  Panic and anxiety disorders have also been associated with parasuicide as have schizophrenia, psychotic disorders, personality disorders, and adjustment disorders." (*Id.*).  The Court has not been provided with any peer-reviewed or other information supporting Dr. Rousseau's purported methodology or theories about Mr. Jernegan, and his opinions and methodology are lacking reliable factual or accepted medical / psychiatric or scientific support. Defendant has also not provided any other examples or instances of admission of similar expert opinions or methodologies by a psychiatrist under these circumstances.

Even if the Court were to find Dr. Rousseau's proposed opinions to be reliable, the opinions are irrelevant.  The issues in this case principally involve (1) whether the defendant deliberately disregarded a serious risk to Mr. Jernegan's health or safety; and (2) whether a county policy or custom was the moving force behind a deprivation of plaintiff's constitutional rights under the Eighth and Fourteenth Amendments.  (*See* Doc. 321).  Civil rights claims based upon jail suicides are treated as claims based on a failure of jail officials to provide medical care for jail inmates in their custody.  (*Id.*, citing authority).  Thus, whether Jail staff knew Mr. Jernegan was suffering from a serious mental illness and was at risk of harm is a consideration. However, defendant has not supplied *any* evidence that Jail staff or medical / mental health staff were listening to or aware of his phone calls at the time, much less that they determined based upon any such calls (as Dr. Rousseau purports to have done) that Jernegan was not really at risk of harm.  Plaintiff also asserts (and defendant does not dispute) that there is no evidence that the phone calls played any role whatsoever in Mr. Jernegan's mental health care at the Jail.  During

his last incarceration before his death, he was not provided any mental health care, was not referred for mental health evaluation, and never saw a psychiatrist or a mental health team member, despite entering a mental health request.

Likewise, defendant has not supplied the Court with any evidence that Jail medical / mental health staff performed the "analysis" that Dr. Rousseau performed, essentially diagnosing Mr. Jernegan as having an Antisocial Personality, which Rousseau concludes would call into question whether he was being truthful when he reported paranoid schizophrenia, hallucinations, and nervousness / depression at the time he was booked into the Jail.   On this point, Dr. Rousseau testified:

> Q.     By the way, you diagnosed Mr. Jernegan as having an antisocial personality disorder; right?
>
> A.     I said within a reasonable medical probability he has an antisocial personality disorder.
>
> Q.     These previous persons at the jail who spoke to Mr. Jernegan, the mental health staff there, any of them reach the diagnosis that you did?
>
> A.     No.
>
> Q.     And so they just missed that?
>
> A.     No. . . . I think to make a personality diagnosis you've go[t] to back up and kind of put together what has been going on with this individual, which I had the opportunity to do in reviewing all of the records, in reviewing phone conversations that he had while he as at the prison.
>
> Q.     (BY MR. BULLOCK) But they didn't identify that, did they?
>
> A.     As I said, no, they didn't.

(Doc. 191-2 at 3, ll.14-25, at 4, ll.1-8).  Because the Jail staff did not rely upon or do any of the analysis performed by Dr. Rousseau, his opinions on these issues simply do not bear upon the Jail staff's actions with respect to Mr. Jernegan's care (or lack thereof), or whether they were

deliberately indifferent or there was a Jail policy or custom that resulted in a constitutional deprivation.

Dr. Rousseau does not explain how his opinion that Mr. Jernegan may have had an Antisocial Personality would be relevant to any issue in the case. Assuming Mr. Jernegan was antisocial, he would still have been entitled to protection under the Eighth and Fourteenth Amendments and to adequate medical care and protection from any known, serious risk of harm. Plaintiff suggests that Dr. Rousseau's opinion regarding Antisocial Personality Disorder is a ruse for a "sinister" purpose: "to raise highly prejudicial and facially irrelevant assertions about Mr. Jernegan's sexual relationships." (Doc. 191 at 7). Thus, plaintiff argues, even were there some relevance to Dr. Rousseau's opinion or analysis of the audiotaped phone calls, any minimal relevance would be substantially outweighed by a danger of unfair prejudice or of confusing or misleading the jury, and would be excluded under Fed. R. Evid. 403. The Court agrees that Dr. Rousseau's analysis and comments regarding Mr. Jernegan's relationship with a girl alleged to be "fourteen or fifteen" and regarding the suggestion of "multiple party sex" are prejudicial, and the Court does not find that analysis or evidence to be probative of any issue in the case. Rather, it appears calculated to cast a cloud on Mr. Jernegan's character, which is not at issue in this case. It is plainly obvious that there are people with undesirable behaviors among an inmate population, but those undesirable behaviors do not diminish a sheriff's obligation to provide adequate medical care to those inmates in conformance with the Eighth and Fourteenth Amendments to the United States Constitution.

Plaintiff's Motion in Limine to preclude Dr. Rousseau's expert testimony (Doc. 191) is **granted**.

## II.      Audio Recordings of Mr. Jernegan's Telephone Calls

Plaintiff argues that the recordings of the telephone calls do not bear upon any issue of consequence in the case.  For the reasons set forth above, those calls do not appear to be relevant, and any probative value of the content of those calls (as they have been described in the briefing and Dr. Rousseau's report) would be substantially outweighed by a danger of unfair prejudice, confusion of the issues, and misleading the jury.  Defendant asserts that the telephone calls are relevant to Mr. Jernegan's "state of mind while incarcerated," but defendant provides no analysis of any particular content that demonstrates any point that is relevant to any material issue in this case.  Defendant has not claimed or provided any evidence that any Jail or medical staff listened to or in any way relied upon the calls for the provision of (or denial of) medical / mental health care to Mr. Jernegan.  Accordingly, Plaintiff's Motion in Limine (Doc. 199) is **granted** on this point, and the audio recordings of telephone calls made by Mr. Jernegan while at the Jail are excluded from the trial of this matter, pursuant to Fed. R. Evid. 402, 403.

## III.     Alleged Relationship with a Female Alleged to Be a Minor

Plaintiff requests that the Court exclude any references or allegations or evidence relating to an alleged relationship between Mr. Jernegan and a female whom defendant has alleged to be fourteen or fifteen.  For the reasons stated herein, such evidence is irrelevant, and is in any event prejudicial.  Plaintiff's Motion in Limine (Doc. 199) is **granted** on this issue, pursuant to Fed. R. Evid. 402, 403.

## IV.     Plaintiff's Guardianship of Two of Mr. Jernegan's Three Children

Plaintiff argues that evidence of her guardianship of two of her grandchildren at the time of Mr. Jernegan's death would be offered only to denigrate Mr. Jernegan in the eyes of the jury and to shift the focus of the jury from defendant's alleged deliberate indifference to Mr.

Jernegan's shortcomings as a parent. Defendant asserts that the grief of the children and their loss of companionship and parental care, training, guidance or education will be a consideration for the jury in determining any economic loss, which necessarily will require the jury to consider Mr. Jernegan's relationship with his children. The Court finds that such evidence is likely relevant to a loss calculation, and plaintiff's request that the Court exclude such evidence is **denied**.

**V.      Evidence that Mr. Jernegan was Positive for Hepatitis C**

Plaintiff requests that the Court exclude references to Mr. Jernegan's status as Hepatitis C positive as it is irrelevant or any relevance is substantially outweighed by prejudice because Hepatitis C is associated with drug activity. Defendant responds that Hepatitis C is relevant because Mr. Jernegan's life expectancy will be an issue for calculation of any damages. Plaintiff notes that defendant has provided no medical evidence that Mr. Jernegan had a shorter life expectancy because of Hepatitis C. Neither party has provided any case authority or medical evidence in support of their argument. In *Meller v. Heil Co.*, 745 F.2d 1297, 1303 (10th Cir. 1984), the defendant in a wrongful death case sought to admit evidence that two hashish pipes containing marijuana residue were found among decedent's possessions at the scene of the fatal accident. The district court excluded the pipes, concluding that their probative value was substantially outweighed by the danger of unfair prejudice. The Tenth Circuit agreed with the district court's exclusion of that evidence, stating that "[the defendant] provided no medical foundation for its claim that [the decedent's] life expectancy was diminished by drug use. . . . It appears that [the defendant] sought to introduce the hashish pipes for the specific purpose of arousing juror sentiment against the decedent. The district court clearly acted properly in excluding this evidence." *Meller*, 745 F.2d at 1303.

As in *Meller*, defendant has not provided a medical foundation for its claim that Mr. Jernegan's Hepatitis C positive status would reduce his life expectancy.  Absent such a foundation, the evidence should not be admitted.  However, as the parties provided little information and no evidence in their briefing on this issue, the Court **will reserve ruling** on this issue until more information is provided to the Court at the time of trial.  At the present time, the Court does not have enough information to determine the relevance of such evidence, if any, or if any probative value of the evidence would be substantially outweighed by a danger of unfair prejudice or confusion of the issues at trial.

IT IS THEREFORE ORDERED that the plaintiff's Motion in Limine to preclude Dr. Rousseau's expert testimony (Doc. 191) is **granted**.

IT IS FURTHER ORDERED that the plaintiff's Motion in Limine (Doc. 199) is **granted in part** and **denied in part**, as set forth herein, and the Court **reserves ruling** on the Hepatitis C issue.

IT IS SO ORDERED this 11th day of March, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE